IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff/Respondent,<br><br>vs.<br><br>GARY LEE QUIGG,<br><br>Defendant/Movant. | Cause No. CR 15-147-BLG-SPW<br>CV 19-001-BLG-SPW<br><br>ORDER DENYING § 2255 MOTION<br>AND DENYING CERTIFICATE<br>OF APPEALABILITY |

This case comes before the Court on Defendant/Movant Gary Lee Quigg's motion to vacate, set aside, or correct his sentence, pursuant to 28 U.S.C. § 2255. Quigg is a federal prisoner proceeding pro se.

## I. Background

On August 17, 2015, Quigg and his co-defendant wife Dusty Whitehouse sold 3.7 grams of methamphetamine to a friend of theirs, Crystal Lopez. Lopez was wearing a wire. An undercover agent, Agent Ivers, waited in the living room. Drugs in hand, Lopez returned to the living room and soon departed with Ivers. But the agent had paid $900. Ivers testified that he expected to receive an ounce, and Lopez testified that the price for a gram was $100. At any rate, everyone agreed that $900 should have bought more than 3.7 grams.

1

Two days later, on August 19, Ivers called Quigg. Quigg acknowledged that Ivers had overpaid and invited him to come to the house again. That evening, Ivers spoke with Whitehouse about getting his money back or getting more product. She asked Quigg for more methamphetamine, but he did not have any. Whitehouse refunded Ivers $300.

On August 25, Ivers again called Quigg and asked to "swing by and visit." After talking about the weather and what day it was, Quigg said he was "between paychecks" and would "find out when I get home." He talked about how busy he was as a paralegal for the State Public Defenders, because so many people were getting charged, and he said he "keep[s] my eyes open." Quigg said he would "check out the situation" and "find out what's going on." Ivers said he had "seven bills." Quigg said "Ok, I'll let them know." U.S. Trial Ex. 8. Quigg did not call Ivers back and did not take any more calls from him.

All of these transactions were recorded and played for the jury at trial.

Quigg was on parole from a 1969 first-degree murder conviction in state court. Whitehouse was on state probation. On September 15, 2015, both were arrested on suspicion of violating their conditions of release. A probation officer retrieved a phone from their vehicle and looked at text messages on it. Agents obtained and executed a search warrant at their home. But Quigg and Whitehouse were not charged in federal court at that point.

2

On October 1, 2015, Charity Mendonsa met a man in Billings at about 11:00 p.m., intending to sell him about eight ounces of methamphetamine. She did sell him the meth, but he too turned out to be an undercover agent, Agent Papke. She was arrested. Agents obtained a search warrant for her pickup truck. Witness Bailey had already told them that Mendonsa brought methamphetamine from California to Montana in a hidden compartment in the tailgate. Agents found the compartment and, in it, two pounds of methamphetamine.

On December 3, 2015, a grand jury indicted Mendonsa, Quigg, and Whitehouse. After Mendonsa pled guilty, a grand jury returned a superseding indictment against Quigg and Whitehouse, charging the following offenses and drug quantities:

Count 1    conspiring to distribute and possess with intent to distribute five hundred (500) grams or more of methamphetamine between December 2014 and September 15, 2015, a violation of 21 U.S.C. § 846;

Count 2    possessing the same with intent to distribute it, a violation of 21 U.S.C. § 841(a)(1); and

Count 3    distributing methamphetamine on August 17, 2015, a violation of 21 U.S.C. § 841(a)(1).

*See* Superseding Indictment (Doc. 91) at 2–3.

Jury trial commenced on January 30, 2017. Mendonsa, Lopez, Bailey, Papke, and Ivers all testified. The jury heard the August 2015 recordings and saw surveillance photographs, photographs from the home search, and text messages

3

retrieved from the phone.

According to Bailey and Agent Martian, in July 2015, Bailey tipped off agents that Mendonsa was going to give Whitehouse whatever methamphetamine she had left on that trip. Agents went to Whitehouse's neighborhood and photographed Mendonsa meeting with her. Mendonsa testified that she and Whitehouse only "used a little" methamphetamine and "went shopping" together on that occasion. *See* 3 Trial Tr. at 364:10–15. But she also testified that, after her husband Kevin died in April 2015, she sold Whitehouse one ounce, and then four ounces—a total of 141.75 grams. In addition, Mendonsa said Quigg called her shortly after Kevin's death to find out whether she was going to deliver $1,800 of methamphetamine Kevin had promised to Quigg. Later, Quigg asked Mendonsa not to front drugs to Whitehouse, because he would end up having to pay for it. *See id.* at 356:5–362:18.

Mendonsa testified that Kevin dealt in large quantities and had about $400,000 in the house when he passed away. The text messages from Quigg and Whitehouse's phone included a query on September 11, 2015, asking Mendonsa when she would be in Billings "so I can get my ducks in a row." Mendonsa responded, "Not sure but ill keep u posted." Trial Ex. 10(B) at 2. This testimony was essential to the drug quantities charged in Counts 1 and 2. In closing, the United States argued that this text was Quigg's way of saying he "wanted a piece

4

of that action" the next time Mendonsa came to Montana. The prosecution urged

the jury to hold Quigg and Whitehouse responsible for the methamphetamine

found in Mendonsa's tailgate. *See* 5 Trial Tr. (Doc. 206) at 788:11–25.

On February 2, 2017, the jury convicted Quigg on all three counts, but it did

not find the drug quantities the United States had charged. It found:

|        |        |
|--------|--------|
| Count 1 | conspiring to distribute and possess with intent to distribute fifty (50) grams or more of methamphetamine between December 2014 and September 15, 2015, a violation of 21 U.S.C. § 846; |
| Count 2 | possessing methamphetamine with intent to distribute it, a violation of 21 U.S.C. § 841(a)(1); and |
| Count 3 | distributing methamphetamine on August 17, 2015, a violation of 21 U.S.C. § 841(a)(1). |

*See* Verdict (Doc. 122) at 1–3.[1]

On May 26, 2017, the Court granted trial counsels' motion to withdraw and

appointed new counsel for Quigg. *See* Order (Doc. 161).

At sentencing, Quigg was held responsible for at least 50 but less than 150

grams of actual methamphetamine—that is, "the weight of the controlled

---

[1] For perspective, 50 grams is a little less than two ounces. Five hundred grams is 17.64 ounces, just over one pound.

Some of Quigg's claims demonstrate a specific misunderstanding about the drug quantity. *See, e.g.*, Exhibit 2 (Doc. 221-1 at 2); Mot. § 2255 (Doc. 221) at 24; Br. in Supp. (Doc. 222) at 27–28, 41; Additional Authorities (Doc. 260) at 3–4. Exhibit 2 referred to the methamphetamine Lopez walked away with on August 17, 2019, as weighing 42.4 grams. That number included all the packaging. The methamphetamine itself weighed 3.7 grams. *See* 3 Trial Tr. (Doc. 204) at 324:3–22.

substance, itself, contained in the mixture or substance." U.S.S.G. § 2D1.1(c)(5) &
Drug Quantity Table Note B (Nov. 1, 2016). With a total adjusted offense level of
30 and a criminal history category of III, Quigg's advisory guideline range was
121 to 151 months. *See* Statement of Reasons (Doc. 183) § III. He was sentenced
to serve 121 months in prison, consecutive to his state sentence, to be followed by
a five-year term of supervised release. *See* Judgment (Doc. 182) at 2–3.

Quigg appealed. He challenged the sufficiency of the evidence, claimed he
played a minimal or minor role in the offense, and argued that his sentence should
not have been based on actual methamphetamine. The Court of Appeals affirmed
his conviction and his sentence. *See* Mem. (Doc. 216) at 1–3, *United States v.
Quigg*, No. 17-30138 (9th Cir. Sept. 5, 2018).

Quigg timely filed his § 2255 motion on December 31, 2018. *See* Mot. §
2255 (Doc. 221) at 34 Decl. ¶ C; *Houston v. Lack*, 487 U.S. 266, 276 (1988).

The Court required trial counsel to submit affidavits concerning one of
Quigg's claims. *See* Order (Doc. 245). Counsel complied on November 20, 2019
(Doc. 249). The Court also ordered the United States to file the pretrial discovery
concerning seizure and search of the cell phone. *See* Order (Doc. 252); U.S.
Resps. (Docs. 258-1, 263-1). Finally, on August 10, 2020, the United States filed
the audio recordings that were played for the jury at trial. *See* Order (Doc. 266);
U.S. Notice (Doc. 267); *see also* U.S. Exhibit List with Admitted Exhibits (Doc.

6

131).

## II. Claims and Analysis

A § 2255 motion "should set out substantive facts that will enable the court to see a real possibility of constitutional error.  Habeas corpus is not a general form of relief for those who seek to explore their case in search of its existence." *Aubut v. Maine*, 431 F.2d 688, 689 (1st Cir. 1970), *quoted in Calderon v. United States Dist. Court*, 98 F.3d 1102, 1106 (9th Cir. 1996); *see also* Rule 4, Rules Governing § 2254 Cases, Advisory Committee Note para. 3 (1976).  A court is not required to assume the truth of conclusory allegations. *See, e.g., Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009).  An evidentiary hearing or further development of the record is necessary only when a § 2255 movant alleges facts that would, if proved true, entitle him to relief. *See, e.g., United States v. Rodriguez-Vega*, 797 F.3d 781, 791–92 (9th Cir. 2015).

Generally, a claim is defaulted if it arises from a matter that is in the record at the time of direct appeal but is not raised on direct appeal. *See, e.g., Bousley v. United States*, 523 U.S. 614, 622–24 (1998); *United States v. Frady*, 456 U.S. 152, 165 (1982).  Quigg's Claims B through J, below, are defaulted.  Rather than extending Quigg an opportunity to excuse his default, *see, e.g., Boyd v. Thompson*, 147 F.3d 1124, 1127–28 (9th Cir. 1998), the Court will proceed as if the default were excused and will address all the claims on their merits.

Quigg's claims are reorganized here, but all are addressed.

## A. Jurisdiction

Claims that subject-matter jurisdiction was absent *ab initio* cannot be waived or defaulted. *See, e.g.*, 28 U.S.C. § 2255(a); *United States v. Cotton*, 535 U.S. 625, 630 (2002); *United States v. Ratigan*, 351 F.3d 957, 962 (9th Cir. 2003).

Quigg alleges the United States never had authority to charge or try him because the State of Montana has not authorized its agents to involve federal authorities in the investigation or prosecution of crime. *See* Mot. § 2255 (Doc. 221) at 2–3; Br. in Supp. (Doc. 222) at 1–3.

The Commerce Clause of the United States Constitution gives the United States jurisdiction to regulate and control commerce, including trafficking in controlled substances. As an attribute of sovereignty, the United States has authority to investigate, prosecute, and sentence persons who violate its laws. A State's laws do not alter, undermine, or qualify federal sovereignty and supremacy. *See, e.g.*, U.S. Const. art. VI cl. 2; *Gonzalez v. Raich*, 545 U.S. at 1, 5, 17–18 (2005).

This Court had jurisdiction because the United States accused Quigg of "offenses against the laws of the United States." 18 U.S.C. § 3231. The State of Montana also could have prosecuted him. *See Gamble v. United States*, __ U.S. __, 139 S. Ct. 1960, 1963–64 (2019). The reason for and extent of cooperation

8

between state and federal authorities is not relevant to anything at issue here. This claim, Mot. § 2255 (Doc. 221) at 2–3; Br. in Supp. (Doc. 222) at 1–3, is denied.

## B. Jury Selection Process

Quigg asserts that the process by which jurors and grand jurors are selected is "unconstitutional as there are not a proportunate [proportionate] number of minorities in the jury pool compared to the percentages of the State's population." Br. in Supp. at 4. He says he has taken a class in which "discriminatory governmental policies and practices were discussed, including problems in voting and lact [lack] of representation in matters such as jury pools." Mot. § 2255 at 4.

An allegation that something is true or believed to be true is not a fact supporting a reasonable inference it is true. Quigg alleges no fact supporting an inference that the representation of any demographic group in the District of Montana's jury pool is disproportionate to its representation in the general population or that drawing jurors from lists of registered voters and licensed drivers, cross-referenced to eliminate double-counting, systematically excludes any particular group. *See* D. Mont. Jury Plan § IV (Feb. 2015); *United States v. Nakai*, 413 F.3d 1019, 1022 (9th Cir. 2005). Unsupported speculation that "an investigation will demonstrate deliberate discriminatory exclusion of minorities from the database from which jurors have been chosen," Br. in Supp. at 6, does not justify further proceedings. This claim, *see* Mot. § 2255 at 3–4; Br. in Supp. at 4–

9

6, is denied.

## C. *Franks* Hearing

Quigg claims he should have had a hearing under *Franks v. Delaware*, 438

U.S. 154 (1978), to determine whether Agent Martian "deliberately lied" in the

affidavit supporting the search warrant authorizing search of Quigg's residence.

The search of Quigg's residence produced very little incriminating evidence, none

of which appeared to implicate Quigg.  Quigg's counsel made hay of that fact at

trial.  *See, e.g.*, 1 Trial Tr. (Doc. 202) at 85:10–92:5, 110:16–112:11; 5 Trial Tr.

(Doc. 206) at 798:19–800:11.  Regardless, the Court will consider the merits of the

claim.

A *Franks* hearing is necessary if "the defendant makes a substantial

preliminary showing that a false statement knowingly and intentionally, or with

reckless disregard for the truth, was included by the affiant in the warrant affidavit,

and if the allegedly false statement is necessary to the finding of probable cause."

*Franks*, 438 U.S. 154, 155–56 (1978).

Quigg says, "One of the suspected lies is believed to be an allegation that

Confidential Informants bought large amounts of drugs" from Quigg.  Mot. § 2255

at 6.[2]  Quigg's brief states that the "suspected lie" occurred when Martian stated

---

[2]  Quigg says he does not have and alleges he was never permitted to see the affidavit
underlying the search warrant.  Agent Martian, however, testified at length at trial about the
course of the investigation.  Obtaining the search warrant was the last (and largely unproductive)

"he had previously interviewed informants or witnesses who claimed to have purchased quantities (perhaps ounces) of methamphetamine" from Quigg. Br. in Supp. at 11. Both Martian and Mendonsa testified under oath at trial that Quigg and Whitehouse bought ounces of methamphetamine. The jury believed at least some of that testimony. Quigg suggests no support for a "preliminary showing" that Martian lied about interviewing people or about what they said or that it was reckless for him to believe they were telling the truth.

Further, a large quantity of methamphetamine was not "necessary to a finding of probable cause" to search the home. The quantity of methamphetamine allegedly involved might be material to the distinction between distribution and possession. But, as mere possession of methamphetamine is illegal, *see* 21 U.S.C. § 844(a); Mont. Code Ann. § 45-9-102(1), whether the amount was large enough to distribute was not an important component of probable cause.

The facts Quigg alleges do not support a reasonable inference that Martian lied or that a false statement was necessary to the finding of probable cause. This claim, *see* Mot. § 2255 at 6–7; Br. in Supp. at 11–12, is denied.

**D. Medications and Hearing Loss**

Quigg claims he was unable to concentrate appropriately or to participate

---

step. The warrant was based principally on informants' statements and Agent Ivers' undercover conversations. *See* 1 Trial Tr. (Doc. 202) at 35:6–58:24.

fully in trial preparation or trial because the Marshals deprived him of his prescription pain medications and because he was hard of hearing. *See* Mot. § 2255 at 7–9; Br. in Supp. at 12–14. The record demonstrates he was able both to hear and to concentrate. *See, e.g.*, 1 Trial Tr. (Doc. 202) at 6:18–7:7; 3 Trial Tr. (Doc. 204) at 301:16–302:6, 389:6–389:12; 4 Trial Tr. (Doc. 205) at 660:18–732:25 (Quigg's two hours of cogent testimony); *see also* Part K(2), below. This claim is denied.

### E. Cell Phone Seizure and Search

Quigg claims his Fourth Amendment right to be free of unreasonable searches and seizures was violated when a probation officer unlocked the car and seized and searched the cell phone he and Whitehouse shared. Alleged violations of the Fourth Amendment exclusionary rule are not cognizable on collateral review. *See Stone v. Powell*, 428 U.S. 465, 482 (1976). The Court will consider this claim only under the rubric of ineffective assistance of counsel.

### F. Other Acts Evidence

Quigg claims he was prejudiced by introduction of evidence about his and Whitehouse's use and possible trafficking in marijuana, dilaudid, and oxycodone. An agent testified that some text messages concerned these drugs. *See, e.g.*, 4 Trial Tr. (Doc. 205) at 589:4–589:15. Lopez testified that she bought methamphetamine and oxycodone from Quigg and Whitehouse. *See* 3 Trial Tr. (Doc. 204) at 454:5–

12

455:13. Quigg testified he dealt in marijuana. He might also have said he obtained oxycodone for Whitehouse, but he did not use any pronouns, so it was hard to tell. *See, e.g.*, 4 Trial Tr. (Doc. 205) at 685:16–686:17.

The jury knew the defendants were on trial only for the charges in the superseding indictment, meaning methamphetamine. *See* Jury Instrs. (Doc. 127) at 26, 29; 4 Trial Tr. (Doc. 205) at 735:2–735:7, 737:9–738:3; *see also id.* at 606:4– 606:8. Prospective jurors were carefully questioned about their views of illegal drugs. *See, e.g.*, 2 Trial Tr. (Doc. 203) at 197:4–197:19, 205:25–206:22, 210:2– 210:24; 214:22–216:5, 219:15–224:1, 233:13–235:10, 237:5–238:10, 241:4– 242:24. And Quigg's voice on the wire with Whitehouse and Agent Ivers was significantly more compelling than the offhand references to other drugs.

Quigg's allegations do not support an inference that specific references to marijuana, dilaudid, and oxycodone "more likely than not affected the verdict." *United States v. Schales*, 546 F.3d 965, 976 (9th Cir. 2008) (citing *United States v. Pang*, 362 F.3d 1187, 1192 (9th Cir. 2004)). This claim, *see* Mot. § 2255 at 19–20; Br. in Supp. at 21–23, is denied.

### G. Rule 32

Quigg correctly points out that Federal Rule of Criminal Procedure 32 requires the probation officer who prepares the presentence report to provide a copy of the draft report "to the defendant, the defendant's attorney, and an attorney

13

for the government." Fed. R. Crim. P. 32(e)(2).  In his case, as in probably all other cases in this Court involving an incarcerated defendant, the probation officer gave a copy of the draft report only to counsel, not to Quigg.  Presentence reports contain intimate and sensitive information about the defendant and many other people that should be protected from disclosure.  Nonetheless, withholding the report from an incarcerated defendant is a literal violation of Rule 32.

Quigg incurred no prejudice.  Six weeks before sentencing, he addressed eleven pages of objections to the probation officer, a clear demonstration that he knew what the draft report said.  *See* Br. in Supp. at 29; Mot. § 2255 Ex. 3 (Doc. 221-1 at 3–13).  At sentencing, the Court resolved objections to matters that affected the sentence.  *See* Fed. R. Crim. P. 32(i)(3)(B).  The sentence was based on the evidence presented at trial, not the presentence report's summary of it.  The Court was not then and is not now obliged to adopt Quigg's interpretation of the evidence.

Requirements for mental health treatment and alcohol abstention and treatment arose from Quigg's history.  *See, e.g.*, Presentence Report ¶¶ 39–40, 57–69.  Even in eleven pages of objections, Quigg did not contest the historical basis for these conditions, and he does not do so now.

Finally, Quigg claims the condition prohibiting use of controlled substances "fails to explain an exception for physician-prescribed drugs."  Br. in Supp. at 32.

14

If and when Quigg is prescribed a federally controlled substance, he may petition for modification of his conditions of supervised release. *See* 18 U.S.C. § 3563(c); Fed. R. Crim. P. 32.1(c).

This claim, *see* Mot. § 2255 at 25–29; Br. in Supp. at 28–33, is denied.

### H. Quantity of Methamphetamine

Quigg claims false information contributed to his sentence. At sentencing, the Court remembered the recording played at trial in which Quigg said "something to the effect that 'I already sold mine.'" Sentencing Tr. (Doc. 208) at 24:16–24:19. The difference between "I gave you the last one I had the other night," Trial Ex. 7 at 1:06:15–1:06:50, and "I already sold mine" is immaterial.

The jury found beyond reasonable doubt that Quigg was responsible for methamphetamine "[w]eighing at least 50 grams." Verdict (Doc. 123) at 2 (Count 1). At sentencing, he was held responsible for methamphetamine weighing "at least 50 grams." *See* Sentencing Tr. (Doc. 208) at 25:16–25:18.

This claim, *see* Mot. § 2255 at 27–29, is denied.

### I. Purity of Methamphetamine

Quigg contends he should not have been sentenced for pure or actual methamphetamine because Mendonsa's trial testimony did not adequately support the purity. He is correct about Mendonsa's testimony. But the testimony of a DEA chemist established the identity and purity of the substance. *See* 3 Trial Tr.

15

(Doc. 204) at 316:12–317:23, 324:3–324:22.[3]

Chief Judge Winmill's opinion in *United States v. Delozier*, No. 4:16-CR-283-BLW (D. Idaho June 15, 2017), is, as Quigg says, "intelligent, progressive, [and] well-reasoned." Mot. § 2255 at 32. But it is not binding, and at any rate, a purity of 98.2% to 100% is at the high end of Judge Winmill's empirical survey of drug purity levels in Idaho in 2015 and 2016. This claim, *see* Mot. § 2255 at 30–32; Br. in Supp. at 33, is denied.

## J. Consecutive Sentence

Quigg claims the Court erred in imposing a consecutive sentence. *See* Mot. § 2255 at 32. The consecutive nature of Quigg's federal term of imprisonment meant that his federal sentence would begin, not when his life sentence "was completed," *id.* at 33, but if and when the State paroled him to the federal sentence. That occurred in January 2019. *See* Final Board Dispositions Oct. 2018 at 24, *available at* https://bopp.mt.gov/Dispositions (accessed August 1, 2019). After he discharges the federal prison term, he will return to Montana to continue serving the state sentence and, if the State paroles him, federal supervised release.

If the State gave Quigg credit for time he served before the federal sentence was imposed, he was not entitled to additional credit for that time against his federal sentence. *See* 18 U.S.C. § 3585(b). Be that as it may, the Federal Bureau

---

[3] See n.1, supra.

of Prisons decides the matter, not the sentencing court. *See United States v.*

*Wilson*, 503 U.S. 329, 333–37 (1992).

Quigg asks why it mattered that his state and federal offenses involved

"entirely different conduct." Mot. (Doc. 221) at 33. It mattered because it showed

that, in the forty-odd years between the state and the federal offenses, *see*

Presentence Report ¶ 39, Quigg did not develop respect for the law.

At sentencing, the Court rhetorically asked whether "it makes any

difference" whether the federal sentence was to run concurrently with or

consecutive to the state sentence. This was an acknowledgment that, first, the state

sentence was life, and second, Quigg would be in prison for at least the next ten

years, either on the revocation of his state parole or serving the federal sentence.

This claim, *see* Mot. § 2255 at 32–33; Br. in Supp. at 33, is denied.

## K. Ineffective Assistance of Counsel

*Strickland v. Washington*, 466 U.S. 668 (1984), sets the standards for claims

of ineffective assistance of counsel. At this stage of the proceedings, Quigg must

allege facts sufficient to support an inference (1) that counsel's performance fell

outside the wide range of reasonable professional assistance, *id.* at 687-88, and (2)

that there is a reasonable probability that, but for counsel's unprofessional

performance, the result of the proceeding would have been different, *id.* at 694. A

reasonable probability is less than a preponderance of the evidence. The prejudice

17

standard is met if the Court's confidence in the outcome of the trial is undermined. *See id.* at 693–94; *cf. Kyles v. Whitley*, 514 U.S. 419, 434 (1995); *United States v. Bagley*, 473 U.S. 667, 682 (1985).

Counsels' strategy was to poke holes in the prosecution's case. They emphasized agents' failure to ensure Lopez was not concealing methamphetamine in her bra before she went into the house Quigg and Whitehouse shared. They pointedly connected the evident lack of money in the home with the case agent's reluctance to state the street value of the methamphetamine he believed Quigg and Whitehouse had sold. Counsel described all the things agents said they would expect to find in a drug house and demonstrated that virtually none were found in Quigg and Whitehouse's home. They emphasized both that Mendonsa said she did not text with Quigg and that other people frequently used Quigg's phone. They emphasized agents' failure to track down anyone other than Bailey and Lopez among the numerous people the prosecution claimed were trying to buy meth from Quigg or Whitehouse. And they pointed out that investigating agents did not look at bank statements to determine whether Quigg and Whitehouse were squirreling away drug money or whether their income and expenses were realistic.

"There are countless ways to provide effective assistance in any given case." *Strickland*, 466 U.S. at 689. Quigg cannot prevail by showing that an alternative strategy was reasonable or that counsel failed to pursue it. He must allege facts

18

supporting an inference that his attorneys' strategy or their execution of it was *un*reasonable.

### 1. Pretrial Release

Quigg claims counsel performed unreasonably and prejudicially by failing to seek pretrial release.[4]  *See* Mot. § 2255 at 32–33.  There is a rebuttable presumption against pretrial release for persons indicted for a federal drug crime carrying a 40-year maximum sentence.  *See* 18 U.S.C. § 3142(e)(3)(A).  In addition, Quigg appeared in this Court on a writ of habeas corpus *ad prosequendum* due to his life-term state sentence for first-degree murder in 1969 and a pending 2015 petition to revoke his parole.  *See* Pretrial Services Report (Doc. 31) at 2–3.  Under these circumstances, few reasonable defense attorneys would have sought pretrial release, and success was unlikely.  Neither prong of the *Strickland* test is met.  This claim, Mot. § 2255 at 32–33, is denied.

### 2. Ability to Consult with Counsel Before Trial

Quigg was detained before trial at Crossroads Correctional Center in Shelby, Montana, about a ten-hour round trip drive from Billings (when the weather is good).  He alleges he was too far away from counsel to permit adequate pretrial consultation.  He believes counsel had only to file a motion to guarantee his transfer to the Yellowstone County Detention Facility.  Quigg also says that he

alone could tell counsel whether the information in the government's pretrial discovery was true or false.

The limited space available at federal pretrial detention facilities in areas near counsel or federal courthouses is frequently an issue in Montana. Motions for transfer are not routinely granted. The email purportedly sent by Chief Federal Defender Anthony Gallagher, *see* Mot. § 2255 Ex. (Doc. 221-1 at 1), regarding monitoring of attorney-client phone calls, is concerning. But even so, Quigg simply asserts that "[b]eing held such a long distance from counsel impeded and prevented any meaningful ability to prepare for trial," Br. in Supp. at 15, without alleging facts supporting an inference that this is true. In fact, virtually everything Quigg says in his § 2255 motion is accompanied by an assertion that he told counsel of his concern. *See, e.g.*, Mot. § 2255 at 4, 6 (twice), 8, 11, 12, 13, 19, 23, 24; Br. in Supp. at 4, 10, 11, 12, 17, 18, 19, 20, 25.

The fact that Quigg was convicted does not support an inference that counsel failed to exercise reasonable professional judgment about the extent and type of input they required from him. And Quigg does not identify any fact or information that came out at trial or sentencing that he did not have a fair opportunity to contest or refute. This claim, *see* Mot. § 2255 at 9–11; Br. in Supp. at 15–16, is denied.

### 3. Local Rule

Quigg says his attorney did not review with him the discovery that was

20

marked "Sensitive." *See* Mot. § 2255 at 12. "Sensitive" discovery contains details about ongoing investigations or personal information or identifiers. A defendant is entitled to see and review it, but it cannot be left in his possession. *See* D. Mont. L.R. CR 16.4(a), (b)(1)(D) (Mar. 1, 2016).

As stated in the preceding section, Quigg does not identify anything that came out at trial or sentencing of which he was not previously aware and which he did not have an opportunity to contest or refute. He offers no reason to suppose a fact contained within this discovery would prove him innocent. This claim, *see* Mot. § 2255 at 11–12; Br. in Supp. at 16–17, is denied.

### 4. Cell Phone Seizure and Search

Quigg alleges counsel should have moved to suppress the fruits of a search of his cell phone. *See* Mot. § 2255 (Doc. 221) at 4–6; Br. in Supp. (Doc. 222) at 6–10. This claim required expansion of the record.[4] *See* Rule 7, Rules Governing § 2255 Proceedings; Orders (Docs. 245, 248, 252, 255). Viewed in light of the additional materials, the claim lacks merit.

One aspect of the claim contends that Montana law governs the text messages' admissibility and a probation officer cannot conduct a search if his intent is to obtain evidence related to a new crime. *See* Br. in Supp. at 6–7; *see*

---

[4] Documents and photographs were filed in the electronic record at the time of trial. *See* Exs. (Doc. 130, 131, 131-1 through 131-38). Discovery and the recordings played for the jury at trial were not.

*also, e.g., Quigg v. France*, 502 F. Supp. 516, 517–18 (D. Mont. 1980). Federal

law controls the admissibility of evidence in federal court. *See, e.g., United States*

*v. Seerden*, 916 F.3d 360, 366 (4th Cir. 2019); *United States v. Chavez-Vernaza*,

844 F.2d 1368, 1374 (9th Cir. 1987). Controlling Fourth Amendment law (and

probably state law too, but no matter) does not depend on the officer's motivation.

*See Samson v. California*, 547 U.S. 843, 851–54 (2006); *United States v. Knights*,

534 U.S. 112, 116 (2001); *cf. Whren v. United States*, 517 U.S. 806, 813 (1996).

Quigg does not suggest the officer lacked reasonable suspicion to justify a search.

This portion of the claim is denied.

The other aspect of the claim alleges that Probation Officer Evans needed a

warrant to search the phone Quigg and Whitehouse shared.

The Court will assume, for the sake of argument, that counsel should have

filed a motion to suppress the text messages obtained from the phone. As a

parolee, Quigg's expectation of privacy was significantly lower than that of both

free citizens and probationers. The Fourth Amendment allows States to authorize

parolee searches without a warrant and even without any reason at all to believe

the parolee has violated the conditions of his release. *See Samson v. California*,

547 U.S. 843, 851–54 (2006). But Montana did not do that with respect to Quigg.

It authorized warrantless search, on reasonable suspicion, of Quigg's "person,

22

vehicle or residence," Am. Report (Doc. 256) at 5 No. 11;[5] Mont. Admin R.
20.7.1101(7) (eff. June 13, 2008) (stating standard conditions), not his phone or
even personal effects.

It can be argued that the probation officer who retrieved the phone from the
vehicle violated the Fourth Amendment by opening it and looking at its recent text
messages. *See Riley v. California*, 573 U.S. 373, 393 (2014). The messages he
found were not probative of the federal charges, but the record does not establish
the legal basis for the extended search of the phone that retrieved the text messages
introduced at trial. *See, e.g.*, 1 Trial Tr. (Doc. 202) at 92:6–10.

Even so, the claim fails on the prejudice prong. The relevant text messages
corroborated some of Mendonsa's and Lopez's testimony and indicated that
whoever was using the phone was willing to engage in buying and selling illegal
substances. The phone received texts from "Charity" at a phone number known to
be used by Mendonsa. *See, e.g.*, Trial Ex. 10(B) (Doc. 131-19) at 2 (Nos. 43–42).
Someone gave Charity's name and number to "Stan K.," *see* Trial Ex. 10(B) (Doc.
131-19) at 3 (No. 87), evidently Stanley Kipp. Kipp was a client at the public
defender's office, *see* 1 Trial Tr. (Doc. 202) at 84:4–84:17 (discussing Mendonsa's

---

[5] Quigg asserts his parole conditions had no effect because he refused to sign them. *See*
Resp. to Counsel Aff. (Doc. 256) at 2. The Court is not aware of any provision of state or federal
law that gives parolees such discretion. Like signing, refusing to sign demonstrates the parolee
has at least had a fair opportunity to be aware of the conditions. *See, e.g., Lambert v. California*,
355 U.S. 225, 227–30 (1957).

texts), and was also involved in trafficking methamphetamine, *see* 3 Trial Tr. (Doc. 204) at 368:4–371:2; 4 Trial Tr. (Doc. 205) at 597:23–598:10.  Lopez testified that she bought methamphetamine and oxycodone from Quigg and Whitehouse, *see* 3 Trial Tr. (Doc. 204) at 454:5–455:13, and texts on the phone discussed OxyContin as well as dilaudid and marijuana, *see, e.g.*, 4 Trial Tr. (Doc. 205) at 685:16–686:9. A reasonable juror could read many of the messages as euphemistic drug talk.

But other evidence corroborated the same central facts.  The jury heard the recording of Lopez and Ivers waiting while Whitehouse dealt with another customer.  *See, e.g.*, Trial Ex. 3 at 25:35–31:00; 3 Trial Tr. at 458:16–459:13. They heard Quigg ask Whitehouse whether she was sure she was giving Lopez $900 worth.  *See* Trial Ex. 3 at 38:35–41:00; *see also* 3 Trial Tr. at 469:9–470:2. They heard Quigg answer the phone and recognize Agent Ivers as the man who was "over at the house the other night."  They heard Quigg say Ivers "left some green papers over there that wasn't supposed to be left there," "considering, uh, these other factors."[6]  They heard Quigg say Whitehouse said Ivers "must have put too many here."  Trial Ex. 5 at 00:40–1:25.  The jury heard Quigg telling Whitehouse, who was trying to come up with three more grams of methamphetamine, "I gave you the last one I had the other night."  They heard

---

[6] Quigg explained he said "green papers" because it was "just the way I felt like talking at the time."  4 Trial Tr. at 680:13–16.  The jury decided what to make of that.

24

Whitehouse say "that" was her "dope," and they heard Quigg say, "Well, that's all I had." Trial Ex. 7 at 1:06:15–1:06:50; *see also* 3 Trial Tr. at 514:1–14. Finally, the jury heard Ivers call Quigg to say he was coming to Billings and had "seven bills." They heard Quigg's friendly conversation and his promise to "check out the situation" when he got home and call Ivers back. *See* Trial Ex. 8 at 2:45–3:50.

The undercover recordings showed that Quigg and Whitehouse were involved in selling methamphetamine, corroborating Lopez and Ivers' testimony. The recordings also showed that Quigg and Whitehouse had multiple but irregular sources, corroborating Mendonsa's testimony that she supplied them with methamphetamine when she had it.

Attempting to hold Quigg and Whitehouse responsible for 500 grams or more of methamphetamine, the United States encouraged the jury to attribute to them the 32 ounces (920 grams) of methamphetamine in Mendonsa's tailgate. Had the jury made that finding, a text to Mendonsa on September 11, 2015, would demonstrate a reasonable probability of acquittal but for the texts obtained from the phone. But the jury did not make that finding. Prejudice might also have been shown if Quigg and Whitehouse denied knowing Mendonsa, but they always agreed they knew her and talked to her on the phone.

Perhaps the text messages "sealed the deal," but the Court has no doubt the jury would have arrived at the same verdict without them. This claim, *see* Mot. §

25

2255 (Doc. 221) at 4–6; Br. in Supp. (Doc. 222) at 6–10, is denied.

### 5. Defense Witnesses

Quigg avers that counsel were ineffective because they failed to call witnesses who could have contradicted certain aspects of prosecution witnesses' testimony.[7] Most of this testimony was not compelling. Quigg testified he had not known Kevin Mendonsa for a long time, *see* 4 Trial Tr. (Doc. 205) at 665:11–19, whereas Charity Mendonsa said Kevin told her he had known Quigg "from when they were younger," *see* 3 Trial Tr. at 386:2–14. But everyone agreed they met months before December 2014, the beginning of the alleged conspiracy. *See* 3 Trial Tr. at 340:13–341:9 (Mendonsa testifies she and Kevin moved back to Montana in September 2014); 4 Trial Tr. at 665:11–17 (Quigg testifies they met in May 2014). And, although Quigg says counsel should have corroborated the portion of his testimony that contradicted witness Bailey, *see* Mot. § 2255 at 21, she was hardly a strong witness. She rightly predicted that Mendonsa and Whitehouse were going to meet in July 2015, and she corroborated Mendonsa's testimony that Whitehouse bought four ounces of methamphetamine in the spring. But she was fairly described as "erratic" even without contradictory testimony.

---

[7] One of these witnesses was Whitehouse. *See* Br. in Supp. at 19. She did not testify. A party may not call a witness who intends to invoke the right not to testify. *See, e.g., United States v. Klinger*, 128 F.3d 705, 709 (9th Cir. 1997). Counsel's failure to call Whitehouse was not ineffective.

*See, e.g.*, 5 Trial Tr. (Doc. 206) at 789:21–23.  Failure to pursue witness testimony

on these points was neither unreasonable nor prejudicial.

Quigg also says he provided counsel with the names of witnesses who could

have testified to the innocent nature of the text messages found on the phone.  *See*

Mot. § 2255 at 12–13; Br. in Supp. at 18–20.  But Quigg does not suggest he could

have provided an innocent explanation for *every* text message.  And, at any rate,

counsel used the text messages to Quigg's advantage.  There was evidence that

Quigg did not send all of the outgoing messages, so the fact they were all signed

"Quiggs" was not conclusive.  *See, e.g.*, U.S. Trial Ex. 10(B) (Doc. 131-19) at 6

Nos. 167, 165, 164; 1 Trial Tr. (Doc. 202) at 92:6–93:5, 128:7–129:3; 4 Trial Tr.

(Doc. 205) at 622:24–624:8, 724:11–724:14.  Further, some messages supported

the defense, and the investigators' misinterpretation of others undermined the

prosecution's credibility.  Counsel's use of this evidence was more than

reasonable.  *See, e.g.*, 1 Trial Tr. (Doc. 202) at 93:11–95:2; 4 Trial Tr. (Doc. 205)

at 608:7–609:3; *compare* 4 Trial Tr. (Doc. 205) at 590:5–590:23 *with id.* at 607:6–

607:25, 684:18–685:15; *compare* 4 Trial Tr. at 588:13–588:25 *with id.* at 596:12–

596:22.  Without calling witnesses, counsel pointedly demonstrated the ambiguity

of the text messages in a way that served Quigg well.  *Compare, e.g.*, 5 Trial Tr.

(Doc. 206) at 791:11–791:25 *with* 3 Trial Tr. (Doc. 204) at 384:2–384:23, 4 Trial

Tr. (Doc. 205) at 608:4–609:3.

Quigg's claim regarding defense witnesses identifies another approach that might have proved reasonable without demonstrating that counsels' choices were unreasonable. His allegations do not support either an inference that counsel performed unreasonably or that he was prejudiced by the lack of witness testimony. Neither prong of the *Strickland* test is met. This claim, *see* Mot. § 2255 at 12–13; Br. in Supp. at 18–20, is denied.

### 6. Counsel's Payment

Quigg believes counsel believed he was not being paid enough. He points to counsel's motion to designate the matter extended or complex, which sought payment over the then-authorized $10,000 waivable limit for felony representation.[8] *See, e.g.*, Br. in Supp. at 35, 37. The limit is waived if the trial court finds the matter was extended or complex, meaning that it required more time than a typical felony case and/or complicated issues arose. *See* CJA Guidelines §§ 230.23.30, 230.23.40, *available at* https://www.uscourts.gov/rules-policies/judiciary-policies/criminal-justice-act-cja-guidelines (accessed Jan. 12, 2021). Counsel's motion was unremarkable. This claim, *see* Br. in Supp. at 35, 37, is denied.

### 7. Conclusion: Ineffective Assistance of Counsel

---

[8] The motions (Docs. 189, 190) were stricken pursuant to the District's CJA Plan. *See* Ex Parte Order (Doc. 194) at 1; 2014 CJA Plan App. B Part III(B)(1)(b). The second motion was a corrected version of the first.

None of Quigg's claims of ineffective assistance makes an adequate showing on both prongs of the *Strickland* test to support further proceedings. They are denied.

## L. Prosecutorial Misconduct and Related Ineffective Assistance

Quigg alleges that the prosecution engaged in misconduct by knowingly presenting false testimony from witnesses Mendonsa, Lopez, Bailey, and Ivers and/or by withholding evidence that would have shown their testimony to be false. He also claims counsel was ineffective for failing to obtain the evidence that was withheld.

A prosecutor's knowing use of false evidence to obtain a conviction violates due process. *See Napue v. Illinois*, 360 U.S. 264 (1959); *Mooney v. Holohan*, 294 U.S. 103 (1935). To show a violation, the defendant must show that the challenged evidence was both material and false, and that the prosecution knew or should have known it was false. *See Napue*, 360 U.S. at 269–71. Materiality is established if it is reasonably likely the evidence affected the jury's decision. *See id.*; *see also United States v. Young*, 17 F.3d 1201, 1203 (9th Cir. 1994) (quoting *United States v. Agurs*, 427 U.S. 97, 103 (1976)); *United States v. Endicott*, 869 F.2d 452, 455 (9th Cir. 1989). As is true of *Strickland* prejudice, a reasonable likelihood is less than a preponderance of the evidence. *Cf. United States v. Bagley*, 473 U.S. 667, 681–82 (1985).

29

## 1. Failure to Record Interviews

From the fact that some witness interviews were not recorded, Quigg infers the prosecution suborned perjury and permitted the introduction of false evidence, either deliberately to deprive him of a fair trial, or unknowingly but with reckless disregard for the truth. He says:

> By refusing to engage in even a rudimentary, basic investigatory technique such as the recording of interviews with government agents, there is no way to determine the extent of the Prosecutor and his Law Enforcement Agents priming their witnesses to give false testimony at trial and making the material falsifications in their statements thay [they] had not previously done. Even a cursory attempt by the Prosecutor would have shown his witnesses were lying. (Of course, it also possible that the government <u>did</u> obtain records that would have shown their witnesses' testimony and statements to be false.)

Br. in Supp. (Doc. 222) at 20–21.

These allegations merely assume agents coached witnesses to make false statements. The mere absence of a recording does not support a reasonable inference that a crime occurred. This claim, *see* Br. in Supp. at 20–21, 24–25, is denied.

## 2. Mendonsa's Calls

As to each of the following allegations, Quigg claims either that phone records would demonstrate Mendonsa lied or that counsel should have obtained emails from Quigg's computer "to demonstrate the timing of those messages in relation to the calls exchanged with Mendonsa on the matter." Br. in Supp. at 39.

- Quigg and Whitehouse did not place calls to Mendonsa, but she placed four calls to them at the time of her husband's funeral in April 2015. *Compare* 3 Trial Tr. (Doc. 204) at 356:5–357:23 (Mendonsa says Quigg called her), *with* 4 Trial Tr. (Doc. 205) at 717:1–718:17 (Quigg says Mendonsa called him).

- Mendonsa testified that she talked to Whitehouse on the phone a week before she traveled to Montana in October 2015, *see* 3 Trial Tr. at 380:4–380:8, but Whitehouse was arrested on September 15, two weeks before Mendonsa's trip.

- Phone calls between Quigg and Mendonsa in July 2015[9] concerned a truck and a tort claim involving the city and Quigg had emails to prove it.

*See* Mot. § 2255 at 14–15; Br. in Supp. at 39–40.

None of these purported lies or omissions is probative, whether viewed as evidence of perjury or as unexplored impeachment material, and whether viewed singly or together.[10] Irrefutable evidence of who called whom and of the content of contemporaneous emails is not evidence of what anyone said on the phone.

---

[9] Elsewhere, Quigg asks the Court to subpoena Mendonsa's phone records to show that she did not connect with his number between April 14 and 30, 2015, or between July 20 and 31, 2015. *See* Mot. for Discovery (Doc. 221-2) at 4. But he admits that he and/or Whitehouse communicated with Mendonsa in both April and July.

[10] The United States sought to persuade the jury to attribute 500 or more grams of methamphetamine to Whitehouse and Quigg. A demonstrative exhibit set out these quantities. *See* 4 Trial Tr. (Doc. 205) at 577:3–580:15; Mot. § 2255 at 18. Agent Martian testified that, based on Mendonsa's testimony, Whitehouse and Quigg received ten ounces each month from November 2014 through March 2015, for a total of 50 ounces, or 1,417.5 grams. *See id.* at 577:8–578:21. And he testified they received a total of about five ounces on one occasion in the spring of 2015 and on July 30, 2015, plus 3.7 grams on August 17, 2015. *See id.* at 579:4–580:7. The overall total shown in the exhibit was about 55 ounces or 1,559 grams. *See id.* at 580:9–15. But the jury only held Quigg responsible for 50 or more grams of methamphetamine on Count 1, not 500 or more. It was not convinced by Martian's estimates.

People frequently forget who called whom, or how many times they might have talked on a particular day several months in the past, or whether they talked to someone on the phone one week before another event or two or three weeks or a month before that event.  More than one topic can be discussed in a phone call, and people do not necessarily talk about the same thing in an email and a contemporaneous phone call.

Even assuming the evidence Quigg discusses might have undermined Mendonsa's credibility to some extent, the most important testimony she gave—that she provided methamphetamine to Quigg and Whitehouse—was corroborated by their own recorded statements on the wire, which indicated they had a source of supply and wanted to sell methamphetamine.  Quigg's allegations do not support an inference either that counsel performed unreasonably or that he was prejudiced as a result.  All claims connected with Mendonsa's phone calls, *see* Mot. § 2255 at 14–15; Br. in Supp. at 39–40, are denied.

### 3. Lopez's and Ivers' Calls

Quigg claims phone records would show that Lopez did not call him and Whitehouse before she arrived with Agent Ivers to purchase methamphetamine. He also points out that the call was not recorded, though others were.  He claims there is a question about whether Lopez had $900 before she went to the back bedroom with Whitehouse and Quigg or whether Ivers kept the cash until Lopez

32

had the methamphetamine.  He claims Ivers "lied about not making a third call" to

him, Br. in Supp. at 40, and he claims the contents of that call were "completely

exculpatory," Mot. § 2255 at 18–19.

Again, these purported lies or omissions are not probative, viewed either as

evidence of perjury or as unexplored impeachment material.  Quigg testified that

he talked to Lopez's husband T.J. on the phone before Lopez came over.  *See* 4

Trial Tr. (Doc. 205) at 673:6–674:8; *see also* 5 Trial Tr. (Doc. 206) at 794:4–

794:9.  Lopez did not say she used her own phone, so her testimony was not

inconsistent with Quigg's.  *See* 3 Trial Tr. (Doc. 204) at 452:15–453:17, 455:15–

456:24, 457:7–457:23.  The jury knew the call was not recorded and could

consider whether that mattered.  Ivers did indeed say agents provided Lopez with

$900 when she wired up, *see* 3 Trial Tr. at 495:5–495:9, but he responded to a

follow-up question by saying, "I'm sorry.  I kept that [the $900].  It was just for her

knowledge that she had the $900," *id.* at 495:11–15.  The jury could decide

whether Ivers "tripped up" in his scheme to testify falsely or simply misspoke.

And Quigg fails to explain how a third phone call by Ivers could be "completely

exculpatory" in view of the recordings made by Lopez and Ivers.

In view of what the jury knew at trial, Quigg's allegations add nothing that

would make a reasonable juror more likely to believe Ivers or Lopez lied.  All

claims connected with Lopez's and Ivers' phone calls, *see* Mot. § 2255 at 15–19;

Br. in Supp. at 40, are denied.

### 4. Mendonsa's Statements and Motives

Quigg says, "Prior to the coaching of Mendonsa, there were no allegations made against Gary/Dusty of alleged drugs being purchased from Mendonsa's husband, Kevin." Mot. § 2255 at 20. Mendonsa's statements to law enforcement did indeed change over time. This common occurrence is one reason some cases go to trial.

At trial, the jury heard Mendonsa admit her statements had changed and heard her explain why. *See* 3 Trial Tr. (Doc. 204) at 336:6–339:5. There is no need to "speculate what threats or inducements Mart[ia]n and [prosecutor] Whittaker could have used to persuade Mendonsa" to testify as she did. *See* Mot. § 2255 at 21. The jury knew the United States allowed Mendonsa to plead guilty to a reduced charge in exchange for her cooperation. The jury also knew that she stood to gain more of a reduction after trial. *See* 3 Trial Tr. at 334:8–335:22, 393:5–395:2; 5 Trial Tr. at 804:25–806:7. Again, Quigg's allegations add nothing the jury did not know.

Quigg has also suggested Mendonsa was angry at him and Whitehouse for not telling her where her husband's funeral was being held. But the jury knew Mendonsa and Kevin's stepson did not get along and that she did not know there was a funeral. *See* 3 Trial Tr. at 355:23–356:22. Quigg told the jury she had

34

"deserted" Kevin "and moved back to California."  4 Trial Tr. at 717:13–717:24.

Quigg's new suggestion does not add a new probative fact unknown to the jury.

This claim, *see* Mot. § 2255 at 20–21, is denied.

### 5. Failure to Introduce Additional Evidence

Quigg alleges that counsel failed to obtain and the United States failed to

produce several items of evidence.  These items either have low probative value, or

do not appear to exist, or both.[11]

Neither the presence nor the absence of Quigg's DNA or fingerprints on any

item taken from his home would be probative.  DNA and fingerprints are not

infallibly transferred in forensically useful form to every surface they touch.

Assuming the truth of Quigg's claim that the United States did not attempt to

enhance the Lopez recording to clarify it, that does not mean the recording *could*

have been clarified or that doing so *would* have helped Quigg.  The jury heard the

recording and also heard Lopez being cross-examined about why she whispered.  It

used its common sense to decide whether inaudible or garbled things might

exculpate Quigg.  What was audible was incriminating.

The United States had no obligation to accept the validity of any polygraph

---

[11] Quigg's approach assumes that absence of evidence is not only evidence of absence but evidence of malfeasance.  The logic is spurious.  Ivers could have implanted a tiny camera in Lopez's hair, yet no video footage was produced to the defense.  From these facts, a reasonable person would not infer that Ivers suppressed pictures showing that the person speaking on the recording was not Quigg.

test Quigg might have taken or the truth of any statement he might have made under the influence of hypnosis or "truth serum." He testified at trial with no evident gaps in his memory, so there is no reason to suppose his right to testify was impeded in any way. *See, e.g., Rock v. Arkansas*, 483 U.S. 44, 56–62 (1987). It does not appear Quigg is suggesting the United States should have compelled its own witnesses to submit to polygraph tests, hypnosis, and/or "truth serum," but if he is suggesting that, no precedent supports relief on that basis.

This claim, *see* Mot. § 2255 at 22–23; Br. in Supp. at 25–27, is denied.

### III. Other Motions

Quigg moves the Court to authorize discovery, expand the record, appoint an investigator, and deliver to him the discovery designated "sensitive." *See* Docs. 221-2, 221-3, 221-4, 247. These requests are aimed at obtaining information the Court has found immaterial to Quigg's conviction and sentence. All are denied.

Quigg also asks the Court to "clarify" how it knows that the recordings were important to the jury. *See* Mot. for Clarification (Doc. 269) at 1. One of the things judges routinely do is assess the effect of evidence. *See, e.g.*, Fed. R. Evid. 403. The Court recalls the trial and the effect of the recordings.

### IV. Certificate of Appealability

"The district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." Rule 11(a), Rules Governing § 2255

36

Proceedings. A COA should issue as to those claims on which the petitioner makes "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). The standard is satisfied if "jurists of reason could disagree with the district court's resolution of [the] constitutional claims" or "conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003) (citing *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)); *see also Buck v. Davis*, __ U.S. __, 137 S. Ct. 759, 773–74 (2017).

Quigg's claims do not meet the standard. The United States had jurisdiction to try him for violations of federal law, with or without state officers. Quigg offers no reason to suppose a jury pool composed of lists of registered voters and licensed drivers, cross-referenced to eliminate double-counting, systematically excludes anyone. His claim for a *Franks* hearing fails to allege reason to believe the warrant application contained any inaccuracy, much less a lie. Quigg's conduct before and at trial preclude the possibility that his medications or hearing loss hampered him. Voir dire and limiting instructions confined the jury's use of other acts evidence.

The eleven pages of objections Quigg sent his counsel defeat an inference that he was unaware of the contents of the presentence report, and the conditions to which he objects, as well as his consecutive sentence, were grounded in the record. The base offense level was the lowest consistent with the jury's verdict. Quigg overlooks the chemist's testimony about the purity of the methamphetamine sold to

Lopez.

Quigg's claims of ineffective assistance of counsel are unpersuasive.
Pretrial release was unrealistic for a state parolee in a presumption case under 18
U.S.C. § 3142. Quigg's missives to counsel show that he adequately consulted
with them before trial. He identifies no "sensitive" discovery he was unable to
contest or that could reasonably be anticipated to establish his innocence. Even
assuming counsel should have tried to exclude text messages found on Mendonsa's
phone, the jury's verdict on drug quantity negated their prejudice. Although
calling additional defense witnesses might have been reasonable, Quigg's
allegations do not support an inference that counsels' approach was unreasonable.
Quigg simply misunderstands counsel's motion concerning his payment.

Quigg's claims of prosecutorial misconduct are similarly misguided. In
general, they posit perjury and then point to the absence of evidence as
corroboration. His allegations focus on minor matters unlikely to influence the
verdict, particularly in view of his statements on the wire.

Quigg does not identify any fact he did not have a fair opportunity to contest
at trial or sentencing. Nor does he identify any fact that could have resulted in a
lesser sentence or that might have led to his acquittal. None of his claims makes a
showing of any substance that he was deprived of a constitutional right. A COA is
not warranted.

38

Accordingly, IT IS ORDERED:

1. Quigg's motion to vacate, set aside, or correct the sentence under 28 U.S.C. § 2255 (Doc. 221) is DENIED.

2. Quigg's motions for discovery, expansion of the record, appointment of an investigator, and clarification (Docs. 221-2, 221-3, 221-4, 269) are DENIED.

3. A certificate of appealability is DENIED.  The Clerk of Court shall immediately process the appeal if Quigg files a Notice of Appeal.

4. The Clerk of Court shall ensure that all pending motions in this case and in CV 19-01-BLG-SPW are terminated and shall close the civil file by entering judgment in favor of the United States and against Quigg.

DATED this  27th  day of January, 2021.

Susan P. Watters
United States District Court

39